1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9

10   LINA AL ZIADAT,              ) Case No. EDCV 13-0318-JPR
     Guardian Ad Litem of         )
11   A.S.A, a minor,              )
                                  ) **MEMORANDUM OPINION AND ORDER**
12                 Plaintiff,     ) **AFFIRMING COMMISSIONER**
                                  )
13            vs.                 )
                                  )
14   CAROLYN W. COLVIN, Acting    )
     Commissioner of Social       )
15   Security,[1]                 )
                                  )
16                 Defendant.     )
     ───────────────────────────────

17   **I.    PROCEEDINGS**

18        Plaintiff Lina Al Ziadat seeks review of the Commissioner's

19   final decision denying minor Claimant A.S.A.'s application for

20   supplemental security income ("SSI").  The parties consented to

21   the jurisdiction of the undersigned U.S. Magistrate Judge under

22   28 U.S.C. § 636(c).  This matter is before the Court on the

23   parties' Joint Stipulation, filed May 8, 2014, which the Court

24   has taken under submission without oral argument.  For the

25

26   ─────────────────────

27        [1] On February 14, 2013, Colvin became the Acting Commissioner
     of Social Security.  Pursuant to Federal Rule of Civil Procedure
28   25(d), the Court therefore substitutes Colvin for Michael J. Astrue
     as the proper Respondent.

1  reasons stated below, the Commissioner's decision is affirmed and
2  this action is dismissed.

3  **II.  BACKGROUND**

4       Claimant was born on March 18, 2007. (AR 19, 65.)  On March
5  25, 2007, her mother, Plaintiff, filed an application for SSI on
6  her behalf. (AR 65-70.)  Plaintiff alleged that Claimant had
7  been disabled from birth because of "[c]ongenital diaphragmatic
8  hernia" and "lung damage." (AR 91.)  A hearing was held on
9  September 29, 2008, at which Claimant was represented by counsel
10 and Plaintiff and an internist appeared and testified. (See AR
11 270, 288.)  In a written decision issued June 2, 2009, an
12 administrative law judge determined that Claimant was not
13 disabled. (AR 270-85.)

14      On June 30, 2009, Plaintiff filed a new application on
15 Claimant's behalf. (AR 594-97.)  Plaintiff alleged that
16 Claimant's impairments caused her difficulty in understanding and
17 learning and adversely affected her physical abilities, her
18 behavior with others, and her ability to take care of her
19 personal needs. (AR 608-10; see also AR 642 (alleging "[s]peech
20 delays and physical delays").)  Plaintiff also noted Claimant's
21 "hole on her heart [and] mild mitral valve prolapse." (AR 642.)

22      On February 26, 2010, the Appeals Council vacated the June
23 2009 decision and remanded for further proceedings. (AR 288-90.)
24 The council directed the ALJ to make reasonable efforts to secure
25 a qualified pediatrician or appropriate medical specialist to
26 evaluate Claimant's case. (AR 288.)  The council further
27 directed him to enter into the record new evidence from the June
28 2009 application and a treating source. (Id.)

On October 12, 2011, a second hearing was held, at which pediatrician Perry Grossman appeared and testified as a medical expert. (AR 519-47.) In a written decision issued November 14, 2011, the ALJ again determined that Claimant was not disabled. (AR 15-34.) On January 17, 2013, the Appeals Council denied Plaintiff's request for review. (AR 7-9.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

3

**IV.   THE EVALUATION OF CHILDHOOD DISABILITY**

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1013 (9th Cir. 2003).

A.   The Three-Step Evaluation Process

In determining eligibility for SSI based on a childhood disability, the Commissioner follows a three-step evaluation process.  20 C.F.R. § 416.924(a).

In the first step, the Commissioner considers whether the child has engaged in substantial gainful activity; if so, the child is not disabled and the claim must be denied. § 416.924(b).  If the child is not engaged in substantial gainful activity, the second step requires the Commissioner to consider whether she has a "severe" impairment or combination of impairments; if not, a finding of not disabled is made and the claim must be denied.  § 416.924(c).  If the child has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment meets, medically equals, or functionally equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.  § 416.924(d).  If so and the impairment also meets the duration requirement, the child is disabled and benefits are awarded.  Id.

4

An impairment "meets" a listed impairment if it satisfies all of the criteria described in the Listing. § 416.925(c)(3). An impairment "medically equals" a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." § 416.926(a).  An impairment "functionally equals" a listed impairment if it results in marked limitations in at least two of six functional domains or an extreme limitation in at least one domain. § 416.926a(a).  The six functional domains are (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting with and relating to others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. § 416.926a(b)(1)(i)-(vi).  A marked limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(2).  An extreme limitation "interferes very seriously" with those things.  § 416.926a(e)(3).

B.   The ALJ's Application of the Three-Step Process

At step one, the ALJ found that Claimant had never engaged in substantial gainful activity.  (AR 20, 33.)  At step two, he found that she had the severe impairment of Simpson-Golabi-Behmel syndrome ("SGBS").  (AR 20, 33.)  At step three, he found that she did not have an impairment or combination of impairments that met or medically or functionally equaled a Listing.  (AR 20, 34.) Specifically, the ALJ found that Claimant's SGBS did not meet Listings 112.12, 112.10, 12.02 B1, or 112.02 B2 (AR 20) and that she had "less than marked limitation" in each of the six

functional domains (AR 20-34).[2]  He therefore found she was not disabled.  (AR 34.)

**V.  DISCUSSION**

The ALJ Did Not Err in Assessing the Opinion Evidence

Plaintiff contends that the ALJ erred in rejecting the findings and opinions of Claimant's treating physicians and Los Angeles Unified School District ("LAUSD") examiners concerning her functional limitations in favor of the opinion of the medical expert.  (J. Stip. at 3.)

1.  Relevant background

On May 18, 2007, Claimant and her twin brother were born at 34 weeks.  (AR 107.)  Her twin was diagnosed with SGBS, from which the twins' older brother also suffered.  (Id.; see also AR 173.)  Claimant was successfully treated for left-lung alectasis.[3]  (See AR 121, 124.)  On May 24, 2007, she underwent left diaphragmatic hernia repair.  (AR 182-83.)  The procedure was successful and she suffered no complications.  (Id.; see also AR 140-57.)

On October 10, 2007, examining consultant Scott Kopoian

---

[2]The ALJ stated that as an "older infant and toddler," Plaintiff "did not satisfy any of the criterion referenced through Listing 12.02 B1," and as a "preschool child" [sic], she did not "satisfy any criterion referenced through Listing 112.02B2."  (AR 20 (internal quotation marks omitted).)  It appears that the ALJ's reference to "Listing 12.02 B1" was a typographical error, because Listing 12.02 applies to adults, whereas Listing 112.02 applies to children under the age of 18, and subsection B1 specifically refers to "older infants and toddlers."

[3] Alectasis is the collapse of part or all of a lung.  See Alectasis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000065.htm (last updated Aug. 25, 2014).

performed a psychological evaluation of Claimant, who was then four months and 22 days old. (AR 228-32.) He reported that her infant-development scores, when adjusted for premature birth, showed her mental development to be "Within Normal Limits" and her motor development to be "Mildly Delayed." (AR 230.) He estimated her developmental age in both areas to be two months. (Id.) Dr. Kopoian reported that Claimant's scores on the Vineland Adaptive Behavior Scales, which were based upon Plaintiff's reports of Claimant's behavior, were adequate in all categories. (AR 230-31.)

On October 19, 2007, registered play therapist Rita Snell of Kolchins/Thomas Infant Development Services ("KIDS") performed a developmental assessment of Claimant, who was then five months old but had a prematurity-adjusted age of four months. (AR 462-65.) Snell reported the following developmental scores: gross motor skills, eight to 12 weeks; adaptive skills, eight to 16 weeks; fine motor skills, four weeks; language skills, 16 weeks; personal/social skills, eight to 16 weeks. (AR 464.) Snell noted concern with "motor delays and limited mobility" and recommended weekly physical and occupational therapy and biweekly child-development appointments. (AR 465.) Treatment was intended to "facilitate age appropriate motor skills," "[e]ncourage improved upper extremity use," and "improve overall play, learning and interaction skills." (Id.)

On April 18, 2008, child-development specialist Michelle Livolsi of KIDS reported that Claimant, whose adjusted age was then nine and a half months, was social and excited to play but not very mobile. (AR 458; see also AR 459 (noting parents'

7

concern with gross motor skills).)  Livolsi reported the
following developmental scores: cognitive skills, 40 to 44 weeks;
receptive language skills, 36 weeks; expressive language skills,
28 to 36 weeks; fine motor skills, 32 to 40 weeks; gross motor
skills, 32 to 36 weeks; social/self-help skills, 32 weeks.  (AR
460.)  She recommended continued physical and occupational
therapy and increased child-development services.  (AR 459.)

On May 19, 2008, Livolsi completed a developmental progress
report.  (AR 236.)  Claimant's adjusted age was then 10.75
months.  (Id.)  Based on reports from her parents and counselor,
Livolsi assessed the following developmental levels: cognitive
development, 10 to 11 months; communicative development, seven to
nine months; receptive development, nine months; gross motor
skills, eight to nine months; fine motor skills, eight to 10
months; social/emotional development, eight months; adaptive
development, eight months.  (Id.)  Livolsi established a plan for
in-home physical therapy to help Claimant develop the skills
necessary for walking; in-home instruction from a child-
development specialist to improve her understanding of abstract
concepts and develop her problem-solving skills and personal-
social play; weekly in-home occupational therapy to improve eye-
hand coordination; and in-home visits from a respite worker to
afford Claimant's mother relief.  (See AR 239-45.)

On June 14, 2008, Claimant was seen by cardiologist Jay
Pruetz.  (AR 356.)  He noted that she had no chronic medications,
good appetite, and appropriate weight gain.  (Id.)  Her parents
reported nonsevere developmental delays.  (Id.)  Claimant was
able to crawl and stand, had four or five words, and could hold a

bottle.  (Id.)  Claimant "appear[ed] to be doing quite well with
no evidence of heart failure or pulmonary over-circulation."  (AR
357.)  Dr. Pruetz recommended reevaluation in six months.  (AR
358.)

In treatment notes, pediatrician Michelle Thompson
consistently noted that Claimant suffered general developmental
delay.  (See AR 421 (on June 19, 2008, noting "dev[elopmental]
delay, progressing slowly"); AR 423 (on Apr. 10, 2008, noting
"Dev Delay"); AR 425 (on Mar. 13, 2008, noting "Global dev
delay"); AR 427 (on May 22, 2008, noting "Global dev delay").)
In a letter dated June 20, 2008, Dr. Thompson reported that
"[f]rom a developmental standpoint, [Claimant] is delayed
(especially in gross motor skills)."  (AR 250.)

In an August 21, 2008 report, geneticist Shoji Yano reported
that Claimant's gene-mutation analysis was positive for SGBS.
(AR 247-48.)  Based on this result and Claimant's "developmental
delay, early over growth," and other clinical symptoms, Dr. Yano
diagnosed SGBS.  (Id.)  He noted that females often present
milder traits than males but stated that it was "not possible to
predict long term prognosis at this time."  (Id.)

On October 6, 2008, Livolsi noted Claimant's progress with
therapy.  (AR 454-55.)  She reported the following developmental
scores for Claimant, whose adjusted age was then 15 and a half
months: cognitive skills, 15 to 18 months; receptive language
skills, 15 to 18 months; expressive language skills, 15 months;
fine motor skills, 15 to 18 months; gross motor skills, 56 weeks
to 18 months; social/self-help skills, 15 to 18 months.  (AR
456.)  Livolsi recommended continued physical and occupational

therapy and child-development services.  (AR 455.)

On October 22, 2008, Dr. Yano completed a childhood disability assessment form.  (AR 263-66.)  He indicated "marked" limitations in each of the six domains, explaining that "[p]atients with SGBS can have severe mental retardation," "severe global developmental delay," and "major lifethreatening [sic] anomalies."  (AR 264-65.)  With respect to Claimant, Dr. Yano noted that "[i]t is difficult to predict her final IQ at this early stage."  (AR 265.)

On January 26, 2009, Dr. Pruetz reevaluated Claimant, who was "do[ing] very well," had "[n]o concerning symptoms," and was an "active toddler" with "normal energy levels."  (AR 360.)  Dr. Pruetz opined that she would likely need surgery to close the atrial-septal defect in her heart but that there was "no urgency" because she "remain[ed] asymptomatic," "with normal growth."  (AR 362.)

On February 3, 2009, when Claimant was 21 months old, speech language pathologist Natalie Zhitnitsky of KIDS assessed Claimant's play, gesture, language-comprehension, and language-expression skills, which were commensurate with those of an 18-to-21-month-old. (AR 453.)  Zhitnitsky opined that Claimant had "age appropriate expressive, receptive language skills and play skills" and recommended no speech therapy.  (Id.)  Plaintiff, Claimant's mother, agreed.  (Id.)

On February 10, 2009, Stephanie Bankston of Buonora Child Development Center recommended that Claimant's home occupational therapy be decreased to once a month "based on her progress in the areas of sensory-motor/sensory processing skills, fine-

motor/visual-motor skills, and oral-motor/feeding skills during the past several months."  (AR 450.)

On April 30, 2009, Bankston completed a progress report, noting Claimant's "significant progress in all areas of development."  (AR 445 (noting 99% of goals met, 1% "[e]merging"); see also AR 446-47.)  Bankston observed that Claimant "shows appropriate attention span," "participates" "enthusiastically," "needs minimal prompting to finish tasks," "shows tolerance for messy experiences," and "likes to participate in music and movement activities."  (AR 445.) Bankston noted, however, that she "warm[s] up to people slowly," "does not like to be surprised or touched," and "gets very upset" if "startled."  (Id.)  Although she reportedly was using more than 25 words at home, she used fewer in the classroom.  (Id.)

Bankston opined that Claimant continued to exhibit "slight delay in all areas of development."  She reported the following developmental scores for Claimant, who was then 18 months old: cognitive skills, 15 to 18 months; receptive language skills, 15 to 18 months; expressive language skills, 15 to 18 months; gross motor skills, 18 to 20 months; fine motor skills, 15 to 18 months.  (Id.)

On May 12, 2009, physical therapist Heather Andersen of KIDS reported that Claimant "presents with slightly low muscle tone in the lower extremities and trunk" but "no longer demonstrates delays in gross motor development."  (AR 472.)  Andersen recommended that physical therapy be discontinued.  (Id.)

On July 6, 2009, Dr. Pruetz noted mitral valve prolapse and mild mitral regurgitation but said that Claimant continued to do

11

1  well.  (AR 365.)  He recommended that corrective cardiac surgery

2  be performed the following summer.  (Id.)

3      On July 23, 2009, occupational therapist Dawn Mie Kurakazu

4  performed a Pediatric Evaluation of Disability Inventory and

5  reported that Claimant was "functioning below the normative range

6  for all areas of assessment."  (AR 346-47.)  Kurakazu recommended

7  continued occupational, physical, and speech therapy, early

8  intervention programs, behavior therapy, and a more detailed

9  motor assessment.  (AR 347.)

10     On November 2, 2009, Dr. Yano reported that although

11  Claimant might need heart surgery in the future, she had "been

12  well without hospitalization" since her last visit.  (AR 342.)

13  She had stopped attending physical therapy and special education

14  classes.  (AR 343.)  In addition to a heart condition and history

15  of hernia surgery, she had a macrocephalic head,[4] prominent eyes,

16  an upturned nose, and "mild developmental delay," but she was

17  otherwise normal.  (Id.)  Dr. Yano recommended continued special

18  education "to maximize her potential abilities" and suggested

19  that Claimant visit a cardiologist, schedule an abdominal

20  ultrasound to check for childhood tumors, and follow up with him

21  in six months.  (AR 345.)

22     The same day, Dr. Yano completed a childhood disability

23  assessment form, indicating that Claimant suffered "marked"

24  limitations in all six domains.  (AR 506-07.)  He explained that

---

27  [4] Macrocephaly is large head size, which sometimes indicates
that an infant suffers from a medical condition.  See Increased
28  Head Circumference, MedlinePlus, http://www.nlm.nih.gov/medline
plus/ency/article/003305.htm (last updated May 10, 2013).

SGBS "is known to cause developmental delay and mental
retardation" as well as "motor delay." (Id.) He noted
Claimant's congenital heart defects and opined that they "may
worse[n] her motor development and physical stamina." (AR 507.)

On May 17, 2010, Claimant, then one day short of her third
birthday, was assessed by LAUSD staff. (AR 847-61.) Karen
Stanton performed an occupational-therapy assessment, opining
that Claimant displayed "[m]ild delays" in "visual motor skills"
but that the delays "appear[ed] to be due to non preference for
these activities." (AR 851.)

The same day, Lauren Fields performed a language and speech
assessment of Claimant, finding she had a "mild articulation
disorder" but "adequate" "oral motor skills." (AR 858.) She was
reported to have achieved low scores on auditory comprehension
and expressive communication, placing her in the first percentile
for language. (Id.) It was noted that she identified her
articles of clothing, understood spatial concepts and photographs
of familiar objects, recognized action in pictures, and
comprehended the use of objects. (AR 858-59.) She named objects
in photographs, used words more often than gestures to
communicate, asked questions, used words for a variety of
pragmatic functions, used different word combinations, used
plurals, combined three to four words in spontaneous speech, used
gerunds, and answered questions logically. (AR 859.)

Claimant achieved the following developmental scores:
articulation, 24 to 30 months; receptive language, 18 to 24
months; expressive language, 18 to 24 months; pragmatics, 24 to
30 months. (AR 859.) She was reported to have a "severe

13

receptive language and expressive language delay" but "adequate vocabulary." (Id.)

School psychologist Melaney Hendrickson opined that Claimant had "Average" physical and social skills but "Below Average" adaptive, cognitive, communication, and general-development skills. (AR 853.) She was able to label simple pictures, use two- and three-word sentences, and respond and behave appropriately. (AR 854.) She was easily distracted, responded slowly and needed questions repeated, and had difficulty following directions and modeling tasks. (Id.)

The LAUSD examiners' assessments were used to formulate a June 7, 2010 Individualized Education Program ("IEP"). (AR 825-46.)

On December 18, 2010, Dr. Thompson completed a childhood assessment form, indicating that Claimant had "extreme" limitations in acquiring and using information; "marked" limitations in attending to and completing tasks, self-care, interacting and relating with others, and health and physical well-being; and less than marked limitations in moving about and manipulating objects. (AR 516-17.) For every category except health and physical well-being, Dr. Thompson based her assessment of "extreme" and "marked" limitations upon the LAUSD IEP, noting that Claimant "scored well below average for language and cognition." (AR 516.)

On February 2, 2011, the Moreno Valley Unified School District established an IEP for Claimant, then three years and seven months old, providing for specialized academic instruction twice weekly. (AR 650.) Claimant was noted to be inquisitive,

social, and communicative.  (AR 651.)  Her parents expressed

"[n]o real concerns" about her education progress.  (Id.)

Claimant was able to identify simple shapes and a few colors,

count to 10 (sometime omitting six or seven), trace her name, and

identify the letters in it.  (Id.)  "She met all her previous

goals."  (Id.)

    She needed no help with reading, written language, motor

skills, behavioral skills, vocational skills, or health.  (AR

651-52.)  Her motor skills were age appropriate; she walked up

steps using alternating feet, rode a tricycle, ran easily, could

balance on one foot for a few seconds, could manipulate small

objects and stack eight blocks, and could complete a six-piece

puzzle.  (AR 651.)  She was social and talkative, helped and

shared with other students, took turns and lined up

appropriately, finished assignments, and followed teacher

instructions.  (AR 652.)  She fed herself and helped dress

herself, used the toilet and washed her hands independently,

cleaned up toys when asked, and asked for help if she needed it.

(Id.)

    Claimant needed assistance with math and communicative

skills.  (AR 651.)  Specifically, she needed "to be able to

recognize and continue a simple pattern and to be able to

understand and use increasingly complex sentences."  (Id.)  It

was noted that she "use[d] language for a variety of purposes,"

spoke in four- to seven-word sentences, and "follow[ed] familiar

2-step directions" but "often misuse[d] pronouns and

possessives."  (Id.)  Her articulation was age appropriate "90%

of the time."  (AR 659.)

On September 7, 2010, Dr. Yano wrote a letter confirming Claimant's SGBS diagnosis and noting that patients with the syndrome "have an increased risk of developing childhood cancers including hepatoblastoma and developmental delay." (AR 863.)

On November 22, 2010, Claimant underwent cardiac surgery to patch an atrial-septal defect. (AR 865-66.) There were no complications. (AR 866.)

At the October 12, 2011 hearing, Dr. Grossman testified that based upon his review of the medical evidence, Claimant's diaphragmatic hernia and atrial-septal defect were successfully treated and her physical health had been good thereafter. (AR 523-24.) He noted that her development, although difficult to assess in infancy, appeared close to normal when measured against her adjusted age and that the records showed only "slight delay" in development as she aged. (AR 524.) He emphasized her "very good" speech and language evaluation, showing "age-appropriate expressive receptive language skills and facial skills." (Id.) He also noted the December 2009 evaluation that Claimant no longer displayed delays in gross motor development. (AR 524-25.)

Dr. Grossman opined that the LAUSD assessment of severe receptive and language delay was "grossly incompatible" with the findings that Claimant had adequate vocabulary and other details suggesting "a pretty normal, clever 2-year-old." (AR 525.) He found the assessments of Drs. Yano and Thompson to be "patently absurd" because they were considerably more extreme than those of the state-agency physicians. (AR 527.) Dr. Grossman dismissed the finding of very severe receptive and expressive language delay as inconsistent with Claimant's reported performance during

that assessment and the findings of speech and language

pathologist Zhitnitsky.  (AR 529-30.)

Dr. Grossman testified that no Listing was suitable for SGBS

and that Claimant's heart disease was not severe enough to meet

Listing 104.06(C).  (AR 526.)

2.   Applicable law

Three types of physicians may offer opinions in Social

Security cases: (1) those who directly treated the plaintiff, (2)

those who examined but did not treat the plaintiff, and (3) those

who did not treat or examine the plaintiff.  Lester v. Chater, 81

F.3d 821, 830 (9th Cir. 1995).  A treating physician's opinion is

generally entitled to more weight than that of an examining

physician, and an examining physician's opinion is generally

entitled to more weight than that of a nonexamining physician.

Id.

This is true because treating physicians are employed to

cure and have a greater opportunity to know and observe the

claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

If a treating physician's opinion is well supported by medically

acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in the

record, it should be given controlling weight.  § 416.927(c)(2).

If a treating physician's opinion is not given controlling

weight, its weight is determined by length of the treatment

relationship, frequency of examination, nature and extent of the

treatment relationship, amount of evidence supporting the

opinion, consistency with the record as a whole, the doctor's

area of specialization, and other factors.  § 416.927(c)(2)-(6).

17

When a treating or examining doctor's opinion is not contradicted by some evidence in the record, it may be rejected only for "clear and convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).  When a treating or examining physician's opinion is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.  Id.  The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. § 416.927(c)(3)-(6).

In addition to physicians, other licensed specialists can provide evidence to establish an impairment.  § 416.913(a). Licensed or certified psychologists, including school psychologists opining as to intellectual or learning disabilities, and qualified speech-language pathologists are among the "[a]cceptable medical sources."  § 416.913(a)(2), (5). As with physicians, an ALJ must provide specific and legitimate reasons to discount a contradicted opinion from a psychologist or comparable acceptable medical source; he need only provide germane reasons, however, to discount an opinion provided by a nonacceptable medical source.  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).

          3.   Analysis

The ALJ agreed with Dr. Grossman's opinion "overall" and accepted his reasons for finding Claimant not disabled, which were as follows: (1) she had no "sustained impediment on physical functioning"; (2) "the strong weight of the evidence" showed she

18

had "done well in all aspects of health," that is, "physically, cognitively and behaviorally"; (3) the 2010 LAUSD IEP report ranking her in the first percentile for language and finding "severe deficits" was inconsistent with the associated empirical data; (4) the first-percentile ranking and finding of severe deficit were also inconsistent with other evidence in the record, and "such a change in [Claimant's] status within a one-year period is not medically explainable"; (5) the opinions favoring a finding of disability "reflect the worst case scenario of what could result from the disease, but do not reflect what has, in fact, transpired"; and (6) those opinions described limitations using terminology with a specific meaning under Social Security law, but the medical sources making the assessments did not indicate familiarity with those meanings.  (AR 22-23.)

Plaintiff contends that Dr. Grossman's testimony was "[c]ontrary to the overwhelming medical evidence in the record" and that the ALJ erred in relying on it instead of the opinions of Dr. Yano, Dr. Thompson, and the LAUSD assessors.  (J. Stip. at 6.)

### a. *LAUSD IEP*

The ALJ summarized the evidence relevant to Claimant's functioning in each of the six domains: acquiring and using information, attending to and completing tasks, interaction and relating with others, moving about and manipulating objects, caring for oneself, and health and physical well-being.  (See AR 24-33.)  He found that although the LAUSD IEP findings suggested significant limitations in each of the first four domains, those findings were not supported by the underlying data and were

19

1   contradicted by the findings of several other practitioners who

2   had assessed Claimant. (See AR 21-22, 24-31.) In detailing the

3   evidence relevant to each of the six domains of function, the ALJ

4   set forth specific and legitimate bases for discounting the

5   findings in the LAUSD report and for his finding that Claimant

6   suffered from less than marked limitation in each domain. See

7   Lester, 81 F.3d at 830-31; Molina, 674 F.3d at 1111.

8                    i.   *Acquiring and using information*

9        For instance, although Plaintiff emphasizes the LAUSD

10  findings that Claimant had receptive language skills in the first

11  percentile, "severe receptive language and expressive language

12  delay," and "deficits in articulation" (J. Stip. at 5 (quoting AR

13  858-60)), the ALJ rejected the first-percentile ranking as

14  inconsistent with reports that Claimant named objects in

15  photographs, used words more often than gestures to ask

16  questions, used words for a variety of pragmatic functions, used

17  different word combinations, combined three to four words

18  spontaneously, and answered questions logically (AR 22; see AR

19  525, 828, 859). He also found the first-percentile ranking

20  inconsistent with the finding that Claimant was "average" or

21  "below average" in six functional areas, suggesting that any

22  delay was mild. (AR 23; see AR 853.) He noted in particular

23  Claimant's reported response to a language sample, in which she

24  "responded to single words in an immediate context, understood

25  one word in a sentence when the referents were present, and

26  pointed to objects and body parts" when instructed to indicate

27  them to the examiner. (AR 26; see AR 859.) She further

28  "performed some actions with verbal instruction alone," "knew the

names of the familiar people, and used strategies to respond to commands."  (AR 26; see AR 859.)  The ALJ found that this data directly contradicted a finding of "severe receptive language and expressive delay."  (AR 26.)

     The ALJ also found that the LAUSD findings of significant language and expressive delays were contradicted by other assessments of Claimant, which reflected only slight delays significantly ameliorated by therapy.  For instance, he noted that in October 2007, Dr. Kopoian assessed her mental development to be "Within Normal Limits," found her to be "adequate" in all domains tested, and noted that she "was able to perform a number of cognitive tasks within normal limits when corrected for pre-maturity."  (AR 25; see AR 230-31.)  The ALJ noted that, also in October 2007, Snell reported Claimant's language development to be appropriate for her adjusted age of 16 weeks.  (AR 25; see 464.)  The ALJ noted in particular that almost a year and a half later, in February 2009, Zhitnitsky opined that Claimant "appear[ed] to have age appropriate expressive, receptive and play skills," rated her language levels at 18 to 21 months, and recommended no speech therapy.  (AR 25-26; see AR 453.)  The ALJ accepted Dr. Grossman's assertion that it was not medically explainable that Claimant could have deteriorated so rapidly as to merit a first-percentile language ranking and finding of "severe deficits" in communication, cognition, and social skills just over a year later.  (AR 26; see AR 530.)

     The ALJ found that the reliability of the LAUSD IEP was further undermined by the later February 2011 Moreno Valley IEP, which reported that Claimant needed no help with reading or

21

written language.  (AR 23; <u>see</u> AR 651-52.)  Although Claimant was
found to need some assistance with communication skills, she was
deemed to be inquisitive, social, and communicative and to use
age-appropriate articulation "90% of the time."  (AR 651.)  Thus,
the ALJ found that even were he to accept the findings of the
LAUSD IEP, "the 2011 report would show substantial improvement,"
undermining any claim of disability.  (AR 23.)

He therefore reasonably found that Claimant had less than
marked limitations in acquiring and using information.  (AR 26.)

ii.  *Attending to and completing tasks*

Similarly, although the LAUSD IEP assessed "major deficits"
in Claimant's capacity for attending to and completing tasks, the
ALJ found that the underlying data did not support such a severe
assessment.  He noted that Claimant's delays in attending to
tasks and play skills, her desire for attention, and her
vulnerability to distraction were consistent with a finding of
minor deficit.  (AR 27; <u>see</u> AR 833, 874.)  He found, however,
that her reported capacity to sit for the duration of preschool
tasks and to show arousal levels adequate for following
directives and participating in activities suggested that those
deficits were not as major as reported.  (AR 27; <u>see</u> AR 831.)
Moreover, the ALJ found that Stanton's opinion that Claimant's
mild delays were attributable to "non preference for activities"
undermined the findings of attention deficit.  (AR 27; <u>see</u> AR
851.)  He noted, too, Claimant's reported age-appropriate
attention levels.  (AR 27; <u>see</u> AR 850.)  The ALJ thus found that
the LAUSD report offered "[a]t best" a "mixed-bag" that "[did]
not support a 'marked' or greater level of limitation."  (AR 27.)

1    In this domain, too, the ALJ noted the contrary findings of

2  others who had assessed Claimant.  (<u>Id.</u>)  In October 2007, Dr.

3  Kopoian noted that Claimant was attentive to her mother's voice,

4  although she could not copy simple behaviors, such as placing

5  blocks in a box.  (<u>Id.</u>; AR 230.)  The same month, Snell reported

6  that Claimant was alert, responsive, and followed a person moving

7  across the room.  (AR 27; <u>see</u> AR 464.)  In February 2009,

8  Zhitnitsky reported that Claimant exhibited good eye contact and

9  attention during examination.  (AR 27; <u>see</u> AR 452.)  And in April

10  2009, Bankston noted Claimant's appropriate attention span,

11  enthusiastic participation in all learning centers, and need for

12  minimal prompting to finish tasks.  (AR 27; <u>see</u> AR 473.)

13  Finally, the 2011 IEP noted Claimant's interest in reading and

14  her capacity for following instructions and finishing preschool

15  assignments; further, her occasional tantrums were "within normal

16  range for her age," suggesting to the ALJ "a lesser level of

17  concern in this domain" than that indicated by the LAUSD IEP.

18  (AR 28; <u>see</u> AR 651.)

19                    iii. *Interacting and relating with others*

20    The ALJ found even less indication that Claimant struggled

21  to interact and relate with others.  Although Plaintiff reported

22  Claimant's attention-seeking behaviors to the LAUSD, the report

23  reflects a finding that Claimant

24    is sweet and friendly and enjoys children her own age.

25    She responds to requests and knows how to act

26    appropriately.

27  (AR 29; <u>see</u> AR 833.)  This is consistent with findings of others

28  who assessed Claimant, both before and after the LAUSD IEP.  (<u>See</u>

AR 228 (Oct. 2007, Dr. Kopoian noting that Claimant was calm and
attempted to engage others in play); AR 464 (Oct. 2007, Snell
noting that Claimant was alert and responsive, had a social
smile, and laughed aloud); AR 486 (Apr. 2008, Livolsi reporting
that Claimant was "very social," "enjoy[ed] playing with others
around her," and was "almost always smiling and happy"); AR 447
(Apr. 2009, Bankston noting that Claimant had met all goals in
the social/emotional realm); AR 651-52 (2011 IEP describing
Claimant as social and talkative, helping other students, sharing
toys, taking turns and lining up appropriately, and acting out
only within normal range).)  Thus, the ALJ reasonably found that
Claimant had less than marked limitations in interacting and
relating with others.

                    iv.  *Moving about and manipulating objects*

     The ALJ acknowledged consistent findings of mild delay in
Claimant's motor skills.  (AR 30-31; see AR 230 (Oct. 2007, Dr.
Kopoian noting mild delay); AR 464 (Oct. 2007, Snell assessing
fine motor skills at four weeks and gross motor skills at eight
to 12 weeks); AR 459 (Apr. 2008, parents expressing concern with
motor skills); AR 250 (June 2008, Dr. Thompson describing
Claimant as developmentally delayed, especially in gross motor
skills).)  He found, however, that she responded well to
therapies intended to address those deficits.  (AR 30-31; see AR
454-55 (Oct. 2008, Livolsi noting Claimant's progress); AR 445
(Apr. 2009, Bankston noting only "slight delay" in all areas of
development and that 18-month-old Claimant had gross motor skills
at 18 to 20 months and fine motor skills at 15 to 18 months); AR
472 (May 2009, Anderson noting Claimant "no longer demonstrates

24

delays in gross motor development" but only "slightly low muscle tone in the lower extremities and lower trunk," recommending no further physical therapy); AR 343 (Nov. 2009 report that Claimant stopped physical and occupational therapy).)  The ALJ further noted that the LAUSD report mentioned only "mild delays in . . . visual motor skills" attributable to "non preference for these activities" but found Claimant to have "adequate fine motor control using mature grasp patterns and in-hand manipulation skills."  (AR 31; see AR 831, 851.)  Further, the 2011 IEP found that Claimant had no need for help with motor skills and sensory motor integration and could use alternating feet on the stairs, ride a tricycle, run easily, balance on one foot for a few seconds, manipulate small objects, stack eight blocks, and complete a six-piece puzzle.  (AR 31; see AR 651.)  Accordingly, the ALJ found that Claimant had largely overcome her early delays in motor skills through therapy.

Thus, although the LAUSD IEP reported significant limitations corresponding to four of the six domains, the ALJ discounted those assessments.  That the data underlying the LAUSD IEP were inconsistent with the findings and recommendations of the specialists who prepared the report was a specific and legitimate basis to discount their opinions.  See Matney ex rel. Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) ("inconsistencies and ambiguities" in doctor's opinion were specific and legitimate reasons for rejecting it); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between physician's opinion and treatment notes constitutes specific and legitimate reason for rejecting

opinion).  Further, the inconsistency between the LAUSD IEP and the other medical evidence, including the findings of several other child-development specialists, was a specific, legitimate reason to question its reliability.  See § 416.927(c)(4); Houghton v.Comm'r of Soc. Sec. Admin., 493 F. App'x 843, 845 (9th Cir. 2012) (ALJ's finding that doctors' opinions were "internally inconsistent, unsupported by their own treatment records or clinical findings, [and] inconsistent with the record as a whole" constituted specific and legitimate bases for discounting them); Rincon v. Colvin, No. CV 12-10583-PJW, 2014 WL 32114, at *2-3 (C.D. Cal. Jan. 3, 2014) (finding ALJ properly discounted doctor's opinion that was inconsistent with her clinical findings and those of other examining doctors); cf. Crane v. Barnhart, 224 F. App'x 574, 576 (9th Cir. 2007) (ALJ properly rejected opinion of psychologist when it was contradicted by later opinions of two other examining psychologists).

Remand is not warranted on this basis.

b.   *Dr. Yano*

The ALJ rejected Dr. Yano's 2008 and 2009 assessments and 2010 letter as insufficiently specific to Claimant and unsupported by medical evidence.  (See AR 23-24.)

As the ALJ noted, although Dr. Yano twice opined that Claimant suffered "marked" limitations in all six domains, he offered little basis in her medical history for these findings. (AR 23; see AR 263-66, 505-07.)  The ALJ found that Dr. Yano "speaks to the [SGBS] disease process and its potential effects" but "does not speak to the actualization of some of such risks"

26

1  in her case.[5]  (AR 23-24 (citing AR 506-07 (explaining "marked"
2  limitation in four domains by noting "patient's condition is
3  known to cause developmental delay and mental retardation")).)
4  The ALJ noted a "similar" "narrative" in Dr. Yano's 2010 letter.
5  (AR 24; see AR 863 (noting "increased risk of developing
6  childhood cancers . . . and developmental delay").)  Moreover,
7  the ALJ found that "[t]o the extent that Dr. Yano is correct in
8  his reports in stating or suggesting this claimant has
9  developmental delays, he does not quantify them" but rather
10 indicated only that delays may exist.  (AR 24; see AR 264 (noting
11 that her ultimate IQ "is difficult to predict"), 507 (noting that
12 cardiac defect "may worse[n] her motor development and physical
13 stamina"), id. (noting that heart defect "likely compromise[s]
14 her general health").)  In fact, Dr. Yano noted elsewhere that
15 because Claimant is a girl, her SGBS-related symptoms were likely
16 to be milder than her brothers' (see AR 247), and he found her
17 developmental delays to be "mild" (AR 344).
18     That Dr. Yano's opinion as expressed in his assessments and
19 letter was conclusory and unsupported by specific findings
20 regarding Claimant was a legitimate basis to discount his
21 opinion.  Cf. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d
22 1190, 1195 (9th Cir. 2004) ("an ALJ may discredit treating
23 physicians' opinions that are conclusory, brief, and unsupported
24 by the record as a whole . . . or by objective medical
25
26
27     [5] Dr. Yano is a clinical geneticist, which likely explains his
   focus on diagnostics and potential risks rather than the extent of
28 Claimant's symptoms.  (See AR 863 (detailing studies confirming
   SGBS diagnosis).)

findings"); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002)
("The ALJ need not accept the opinion of any physician, including
a treating physician, if that opinion is brief, conclusory, and
inadequately supported by clinical findings.").

Further, the ALJ found Dr. Yano's assessments to be
inconsistent with the medical evidence. (AR 24.) Although Dr.
Yano in his 2009 assessment cited Claimant's developmental delay,
macrocephaly, and "other major malformations including
diaphragmatic hernia and cardiac defects," all consistent with
and likely attributable to SGBS,[6] the ALJ found that those
"features of the disease . . . have not been disabling." (AR 23
(citing AR 505).) Rather, the evidence showed successful
surgical correction of Claimant's hernia and heart defect
"without complication."[7] (AR 23; <u>see</u> AR 157, 865-66.) And, as
discussed above, the record also established that although
Claimant was diagnosed with mild developmental delay, varied
forms of therapy had enabled her to progress physically,
cognitively, and emotionally such that she was able to function
at or near the level expected for a child her age. (<u>See</u> <u>supra</u>
Section V.A.3.a; <u>see, e.g.</u>, AR 445-47, 453, 450, 472, 651-52.)

That Dr. Yano's opinion was inconsistent with the "composite
record" was a specific, legitimate basis to discount his
assessments and letter. <u>See</u> § 416.927(c)(4) (explaining that

_____

[6] Plaintiff's treatment records also reflect the possibility
that her developmental delay was at least somewhat attributable to
premature birth. (<u>See, e.g.</u>, AR 230, 236, 462, 458 (assessing
Claimant according to her age adjusted for prematurity).)

[7] Plaintiff does not challenge the ALJ's finding that her
hernia and heart defect were successfully remedied.

more weight should be afforded to medical opinions that are consistent with the record as a whole); Houghton, 493 F. App'x at 845.  Because the ALJ provided a detailed summary of the medical evidence, his finding that Dr. Yano's opinion was inconsistent with the record was not, as Plaintiff contends, "insufficient" "boiler-plate."  (J. Stip. at 8); see Reddick, 157 F.3d at 725 (explaining that ALJ can meet requisite standard for rejecting treating physician's opinion deemed inconsistent with or unsupported by medical evidence "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings").

Although Plaintiff contends that the ALJ should have contacted Dr. Yano for clarification of his opinion (J. Stip. at 9), a duty to develop the record further is triggered only when it contains ambiguous evidence or is inadequate to allow for proper evaluation of the evidence.  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) (citing Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)).  Here, however, it was clear from the language Dr. Yano used in his assessments and letter that he based his recommendation upon potential future developments rather than Claimant's established symptoms and limitations.  The weight of the evidence showed that Claimant's developmental delays were mild and that she had largely overcome any developmental deficit.

Remand is not warranted on this basis.

1          c.   *Dr. Thompson*

2      Plaintiff offers no argument supporting Dr. Thompson's 2010

3  findings but instead simply complains that the ALJ "made no

4  mention in the decision of [her] assessment." (J. Stip. at 9.)

5  Although the ALJ did not explicitly address the 2010 assessment,

6  he did note Dr. Thompson's opinion that Claimant was

7  developmentally delayed (AR 30), and he relied significantly upon

8  the opinion of Dr. Grossman, who expressly discounted Dr.

9  Thompson's 2010 assessment (<u>see</u> AR 539-44).  Having accepted Dr.

10 Grossman's findings, the ALJ necessarily rejected Dr. Thompson's

11 2010 assessment.

12     Further, although Dr. Thompson found "extreme" or "marked"

13 limitations in five of the six domains, she expressly did so for

14 four of those categories based exclusively upon her review of the

15 2010 LAUSD IEP. (<u>See</u> AR 516.)  Her assessment of these

16 limitations thus has no independent clinical significance.  <u>Cf.</u>

17 <u>Batson</u>, 359 F.3d at 1195 (ALJ properly discounted physician's

18 opinion when based in part on another doctor's records and

19 findings, "the value of which the ALJ had discounted").  Because

20 the ALJ carefully detailed his reasons for rejecting the report

21 upon which Dr. Thompson's assessment was almost completely based,

22 any error in his failure to explicitly address the assessment was

23 harmless.  <u>See</u> <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050,

24 1055 (9th Cir. 2006) (error harmless if inconsequential to

25 ultimate nondisability determination); <u>see also</u> <u>Howard</u>, 341 F.3d

26 at 1012 (holding that ALJ need discuss only evidence that is

27 significant and probative).

28     When medical opinion evidence is inconclusive or

1   conflicting, it is solely the ALJ's role to determine credibility

2   and resolve the conflict.  <u>See</u> <u>Sample v. Schweiker</u>, 694 F.2d 639,

3   642 (9th Cir. 1982); <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169

4   F.3d 595, 601 (9th Cir. 1999) (noting that when medical reports

5   are inconclusive, "questions of credibility and resolution of

6   conflicts in the testimony are functions solely of the

7   [Commissioner]" (internal quotation marks omitted)).  If the

8   medical evidence gives rise to more than one rational

9   interpretation, the ALJ's conclusion must be upheld.  <u>Sample</u>, 694

10  F.2d at 642.

11        Remand is not warranted on this basis.

12                    d.  <u>*Dr. Grossman*</u>

13        Nor did the ALJ err in relying on the testimony of medical

14  expert Dr. Grossman to assess the opinion evidence.  Dr. Grossman

15  not only was a specialist in pediatrics but also had significant

16  experience in child development.  (<u>See</u> AR 522, 539.)  He was

17  familiar with the Social Security regulations and the

18  requirements to qualify for SSI payments.  (<u>See</u> AR 528, 540-41

19  (noting that Claimant's treating practitioners may not have been

20  familiar with meanings of specific terms in Social Security

21  context, as Dr. Grossman was).)  He was, therefore, particularly

22  qualified to assist the ALJ in interpreting Claimant's medical

23  records and offer an opinion as to her disability status, and

24  Plaintiff does not appear to dispute this.[8]  <u>See</u> § 416.927(c)(5)

25

26        [8] Plaintiff objects to Dr. Grossman's suggestion that the
    extreme findings of the above-discussed practitioners were perhaps
27  attributable to a lack of familiarity with the terminology of the
    Social Security regulations or a desire to secure services for
28  Claimant.  (J. Stip. at 7; <u>see</u> AR 543.)  Because he found that

1   (noting that more weight is generally given "to the opinion of a
2   specialist about medical issues related to his or her area of
3   specialty"); <u>Smolen</u>, 80 F.3d at 1285 (same); § 416.927(c)(6)
4   (medical source's "amount of understanding of our disability
5   programs and their evidentiary requirements" is "relevant
6   factor[]" in deciding weight to give opinion);
7   § 416.927(e)(2)(ii) (noting import of consultant physician's
8   expertise in Social Security rules). Indeed, the Appeals
9   Council, which expressly mandated a hearing with a medical expert
10  qualified to assess Claimant's particular symptoms and
11  limitations (AR 288), did not find the ALJ's reliance on Dr.
12  Grossman to warrant review (AR 7-9).

13      Moreover, Dr. Grossman reviewed the entire record, provided
14  bases for his conclusions and opinion, and was available for
15  questioning by Plaintiff's counsel. The ALJ was thus entitled to
16  rely on Dr. Grossman's testimony, which he found to be consistent
17  with the medical evidence. <u>See</u> <u>Morgan</u>, 169 F.3d at 600
18  ("Opinions of a nonexamining, testifying medical advisor may
19  serve as substantial evidence when they are supported by other
20  evidence in the record and are consistent with it."); <u>Andrews v.</u>
21  <u>Shalala</u>, 53 F.3d 1035, 1042 (9th Cir. 1995) (greater weight may
22  be given to nonexamining doctors who are subject to examination).

23      Remand is not warranted.

24

25  ─────────────────

26  Claimant's practitioners provided inaccurate or unsupported
    assessments of her abilities, Dr. Grossman's speculation as to why
27  they did so was not relevant. In any event, a doctor's familiarity
    with the meanings of certain terms as used by the Social Security
28  regulations is indisputably valuable. <u>See</u> § 416.927(e)(2)(ii);
    § 416.927(c)(6); SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996).

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[9] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 29, 2014

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[9]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."